# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**JAMIE MOREL, ET AL.**                    **CIVIL ACTION**

**VERSUS**                                              **NO. 19-12422**

**JOSEPH P. LOPINTO, III, ET AL.**            **SECTION: "H"**

## ORDER AND REASONS

Before the Court is Defendant Joseph P. Lopinto III's Motion for Summary Judgment (Doc. 22). For the following reasons, this Motion is **GRANTED**.

## BACKGROUND

This case arises out of the death of Brian Alexander, a pretrial detainee at Jefferson Parish Correctional Center ("JPCC").[1] The sole remaining Defendant in this case is Joseph Lopinto III, sued in his official capacity as Sheriff of Jefferson Parish.[2] Plaintiffs assert a constitutional claim under 42 U.S.C. § 1983 and a tort claim under state law.

---

[1] Plaintiffs are Jamie Morel, on behalf of Alexander's minor son J.A., and decedent's other son, Hayden Alexander.

[2] Plaintiffs noted in briefing and confirmed at oral argument that all claims except those against Lopinto in his official capacity are voluntarily dismissed. *See* Doc. 33 at 1 n.1, 23. Originally, Defendants were Lopinto, sued in his individual capacity and his official capacity; Sue Ellen Monfra, sued in her individual capacity and official capacity as Jefferson Parish Corrections Bureau Chief; and John and Jane Doe correctional officers as employees of Lopinto. *See* Doc. 1.

On February 1, 2018, Alexander was booked into JPCC on a charge of armed robbery.[3] Upon arrival, he was processed by the sheriff's Code 6 department, which screens incoming inmates to determine whether they will be booked into the jail or released for reasons related to bond, overcrowding, and the like.[4] The Code 6 department examines the criminal history of detainees and assigns them a score from 1 to 20, and inmates who score a 15 or higher are recommended for maximum security.[5] The Code 6 department gave Alexander a score of 5 and sent him to be booked into the jail.[6]

After inmates are processed by the Code 6 department, they are sent for classification. The Classification department is responsible for the safety and security of the inmates and JPCC staff.[7] The Classification department's primary role is assigning inmates to a bed within the tiers of minimum, medium, or maximum security.[8] In addition to making this initial assignment, the Classification department handles all subsequent movements and housing changes of inmates.

The predominant factor in an inmate's classification is the nature of his current charge(s).[9] Additionally, the Classification department keeps and consults a physical document known as an "inmate card" for each inmate that reflects their Code 6 score, housing locations over time alongside brief explanations for any changes in location, and any known enemies so that the Classification department can house them separately.[10] Based on Alexander's

---

[3] *See* Doc. 33-3.
[4] *See* Doc. 22-4 at 17–19; Doc. 33 at 2.
[5] Doc. 22-6 at 21–22.
[6] Doc. 22-4 at 14.
[7] *Id.* at 7–8.
[8] *Id.* JPCC has another tier of security, administrative segregation, discussed below. *See infra* text accompanying notes 15–17.
[9] Doc. 22-4 at 9–10.
[10] *See* Doc. 33-10 (Shorter's inmate cards).

charge of armed robbery, a classification officer placed him in maximum security.[11]

On September 1, 2018, about seven months after Alexander was classified, Press Shorter III was arrested in Jefferson Parish on a number of charges, including battery of a police officer.[12] Because of Shorter's extensive criminal history, the Code 6 department assigned him the maximum score, 20.[13] In accordance with his Code 6 score and violent charges, Shorter, like Alexander, was classified as a maximum-security inmate. On September 4, 2018, just three days after arriving at JPCC, Shorter attacked Alexander in an apparent dispute over the shower queue. Shorter struck Alexander multiple times in the face, causing him to fall over and hit his head on the concrete floor. Two days later, Alexander died from a subdural hematoma. In September 2019, Plaintiffs filed suit for monetary damages under 42 U.S.C. § 1983 and state tort law.

Plaintiffs' Complaint alleges that Defendants failed to have a classification system at JPCC that effectively reduced inmate-on-inmate violence through segregating predators from more vulnerable individuals.[14] Plaintiffs note that JPCC does have a tier of housing that is more restrictive than maximum security, known as "administrative segregation."[15] This is essentially solitary confinement.  Plaintiffs allege that a classification officer could send an inmate directly to administrative segregation when, for example,

---

[11] Doc. 33 at 2.
[12] Doc. 33-6 at 78.
[13] Doc. 33-11 at 2.
[14] Doc. 1 at 4.
[15] Doc. 22-4 at 28.

they were known for being an agitator in the jail.[16]  They further argue that Shorter should have been housed in administrative segregation.[17]

Before the Court is Lopinto's Motion for Summary Judgment as to Plaintiffs' constitutional claim and state law tort claim.[18] Generally, Lopinto argues that Plaintiffs failed to meet their burden under the appropriate standards governing each claim. Plaintiffs oppose.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[19] A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[20]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in her favor.[21] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[22] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[23] "In response to a

---

[16] *See* Doc. 33 at 7–8; *see also* Doc. 33-8 at 27–29.
[17] Doc. 33 at 1.
[18] Doc. 22.
[19] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).
[20] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[21] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 532 (5th Cir. 1997).
[22] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).
[23] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[24] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[25] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[26]

## LAW AND ANALYSIS

Plaintiffs bring two claims against Loptino in his official capacity: one for constitutional violations under 42 U.S.C. § 1983 and another based on Louisiana tort law.[27] Seeking summary judgment, Lopinto argues that the former claim is an episodic-act-or-omission claim,[28] which requires a showing of subjective deliberate indifference on the part of a JPCC official, which Lopinto alleges Plaintiffs cannot show. Plaintiffs counter that their constitutional claim is not an episodic-act-or-omission, but rather a conditions-of-confinement claim, which requires a showing of a policy maintained with objective deliberate indifference.[29] Lopinto further avers that the state law

---

[24] John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

[25] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).

[26] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

[27] Plaintiffs purport to bring a conditions-of-confinement claim *and* a *Monell* claim based on the three-years-only policy. *See* Doc. 33 at 17–21. In reality, there is only one constitutional claim; the Fifth Circuit has made that clear. *See* Estate of Bonilla by & through Bonilla v. Orange Cnty., 982 F.3d 298, 308 (5th Cir. 2020) ("Plaintiffs attempt to predicate liability for Bonilla's suicide on two theories, one derived specifically from *Monell*, and one based on unconstitutional conditions of confinement. This is error.").

[28] Doc. 42 at 3–4.

[29] Doc. 33 at 15–16; *see* Duvall v. Dallas Cnty., 631 F.3d 203, 209 (5th Cir. 2011) ("[T]o show a violation under the municipal-liability 'custom or policy' line of cases, the plaintiff must show that the violation resulted from a custom or policy maintained by the *municipality* with

claims must fail because Plaintiffs do not establish that the any conduct fell below the standard of reasonable or ordinary care. Plaintiffs oppose. The Court will consider each claim in turn.

## I. The Constitutional Claim Against Lopinto in His Official Capacity

"A suit against a government official in his official capacity is a suit against the government entity of which he is an agent."[30] This § 1983 suit against the Jefferson Parish Sheriff in his official capacity is therefore a suit against the municipal entity of the Jefferson Parish Sheriff's Office ("JPSO").[31] JPSO and Sheriff Lopinto are responsible for the safety and security of the inmates at the JPCC.[32] A municipality like the JPSO may be liable under § 1983 for the violation of the constitutional rights of a pretrial detainee like

---

*objective* deliberate indifference."). The elements of a conditions-of-confinement claim are as follows:

> (1) a rule or restriction or the existence of an identifiable intended condition or practice or that the jail official's acts or omissions were sufficiently extended or pervasive; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of the inmate's constitutional rights.

Cadena v. El Paso Cnty., 946 F.3d 717, 727 (5th Cir. 2020) (cleaned up) (quoting *Duvall*, 631 F.3d at 207).

[30] Brown v. St. Landry Par. Sheriff's Dept., 298 F. Supp. 3d 879, 885 (W.D. La. 2018) (citing Burge v. Par. of St. Tammany, 187 F.3d 452, 468 (5th Cir. 1999)).

[31] La. Cleaning Systems v. Brown, No. 14-2853, 2015 WL 9581852, at *2 n.1 (W.D. La. Dec. 30, 2015) ("Caselaw uses the term 'municipal liability' to describe actions against parishes or counties, as well as cities."); s*ee also* Belcher v. Lopinto, 492 F. Supp. 3d 636, 658 (E.D. La. 2020). Sheriff Lopinto, rather than JPSO or JPCC, is the proper defendant. "[A]lthough a sheriff's office is not a legal entity capable of being sued, Louisiana sheriffs are amenable to suit." Cozzo v. Tangipahoa Par. Council-President Gov't, 279 F.3d 273, 283 (5th Cir. 2002). "[A] correctional center may not be sued because it is merely a building, not a 'person' subject to suit under 42 U.S.C. § 1983." Culbertson v. J.P.S.O., No.16-15958, 2017 WL 5133209, at *3 (E.D. La. Nov. 6, 2017).

[32] *Belcher*, 492 F. Supp. 3d at 645.

Alexander.[33] "Pretrial detainees have a constitutional right to . . . protection from harm during their confinement."[34]

"When attributing violations of pretrial detainees' rights to municipalities, the cause of those violations is characterized either as a condition of confinement or as an episodic act or omission."[35] Condition-of-confinement claims are "attacks on 'general conditions, practices, rules, or restrictions of pretrial confinement.'"[36] By contrast, with an episodic-act-or-omission claim, "'the complained-of harm is a particular act or omission of one or more officials,' and 'an actor usually is interposed between the detainee and the municipality.'"[37]

### A.    Condition of Confinement or Episodic Act?

At the outset, this Court must determine whether Plaintiffs' constitutional claim should be categorized as a condition-of-confinement or an episodic-act-or-omission claim.[38] Although Plaintiffs contend that this classification scheme is wrong and should be overruled, they recognize that this Court is bound by Fifth Circuit precedent to apply it.[39] Plaintiffs argue that their case presents a condition-of-confinement claim.[40] In order to determine whether that is the proper classification, the Court must closely examine the factual allegations at the heart of Plaintiffs' constitutional claim.

---

[33] Garza v. City of Donna, 922 F.3d 626, 632 (5th Cir. 2019) (citing Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 (1978)).

[34] Brumfield v. Hollins, 551 F.3d 322, 327 (5th Cir. 2008) (citing Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996)).

[35] Garza, 922 F.3d at 632 (citing Hare, 74 F.3d at 644).

[36] Id. (quoting Hare, 74 F.3d at 644).

[37] Id. (quoting Scott v. Moore, 114 F.3d 51, 53 (5th Cir. 1997) (en banc)).

[38] Flores v. Cnty. of Hardeman, 124 F.3d 736, 738 (5th Cir. 1997) (finding that although plaintiff pled the case as both an episodic act and as a condition of confinement, the court had to consider the case as an episodic act under existing circuit precedent).

[39] Doc. 33 at 14–15.

[40] Id. at 15–16.

### i.    *The Three-Years-Only Policy*

Plaintiffs allege that the relevant condition of Alexander's confinement was the "'three-years-only' policy."[41] Plaintiffs contend that "it was the official policy of the JPCC that classification deputies would not review any information about an inmate if the information was older than three years."[42] Deputy Shantel Simmons, who classified Shorter, applied this three-years-only policy to him.

For every inmate booked at JPCC, a classification officer had to complete a Classification Screening Form that included multiple questions for the inmate, two of which are relevant to this case: "Have you ever assaulted anyone in jail?" and "Have you ever been charged with crimes or rule violations in jail?"[43] Simmons marked "No" in response to both questions on Shorter's form because that is the answer that he provided.[44] That answer was a lie.[45] When asked if there was any method of confirming whether Shorter was telling the truth, Simmons testified that she was trained to check an inmate's criminal history for the past three years but no more than that.[46] In other words, unless the inmate had a relevant incident in the past three years, Simmons would rely solely on the inmate's answers when completing the classification form.

---

[41] *Id.* at 1.

[42] *Id.* at 5–6.

[43] Doc. 33-11 at 2.

[44] *Id.*

[45] Shorter has a criminal history dating back to 2004 when he was a juvenile. Relevant to this case, his prior crimes include breaking another inmate's jaw in 2009 and choking and beating another inmate so badly he needed facial surgery in 2013. Shorter was also charged with domestic violence in 2013. For Shorter's complete history of jail assaults and charges, see Doc. 33-6 at 144–61.

[46] Doc. 33-4 at 19–32. The one exception to this three-year limitation was that if an inmate had any known enemies, then those would stay in JPCC's system longer than three years. *Id.* at 21–26.

Shorter's prior assaults and charges in jail fell outside the three-year window and were thus never included in the screening form.

At the time of booking, classification officers also completed another document relevant to this case, the Prison Rape Elimination Act ("PREA") form.[47] This form lists a number of "Possible Predatory Factors," including "[D]omestic violence – past ten years" and "Strong-arming / assaults in prison – past ten years."[48] The columns for marking "Yes" or "No" with respect to these factors were blank on Shorter's form, despite the fact that Shorter had a domestic violence charge and a history of assaults in prison within the past 10 years.[49] Simmons testified that she looked back only three years to complete this form as well.[50] Had the PREA form been properly completed by Simmons, the form would have designated him as a "Potential Predator."

Notably, Plaintiffs indicate that this three-years-only policy contradicts JPCC's written policy on classification.[51] The official, written Classification Policy instructs officers to use ARMMS—the jail's computer database—to review an arrest report as to current charges and for a past record.[52] It contains no three-year limit on that report.

The heart of Plaintiffs' argument is that Deputy Simmons's oversights and omissions with respect to the Classification Screening and PREA forms

---

[47] *See* Doc. 33-11 at 3. There is conflicting testimony on whether the Classification department *always* completed this PREA form or another department might sometimes do so. At one point, Simmons testified that it was standard practice for the Classification department to fill this form out, Doc. 22-6 at 69–70, but elsewhere she stated that sometimes the Medical department would complete the PREA form, *id.* at 24–26.

[48] Doc. 33-11 at 3.

[49] *Id.*

[50] Doc. 33-4 at 32.

[51] Doc. 33 at 7.

[52] Doc. 33-12 at 2 ("Through ARMMS an arrest report shall be reviewed on each prisoner relating to current charges *and for a past record for classification purposes*.") (emphasis added).

resulted from the three-years-only policy. Without the three-year limit in place, Plaintiffs aver that Simmons would have checked Shorter's history in ARMMS, properly completed the intake forms, and recommended him for administrative segregation, where he could not have killed Alexander.[53] As proof of this theory, Plaintiffs present testimony from Simmons to the effect that if Shorter had answered truthfully that he had assaulted people in prison and had prior charges for domestic violence, then she would have recommended him for administrative segregation.[54]

To support the argument that this alleged three-year rule was the official policy of JPCC and not merely a one-off mistake from Deputy Simmons, Plaintiffs cite to additional testimony from Simmons stating that she was trained to look at an inmate's history dating back three years and no more.[55] Plaintiffs additionally note that Sergeant Christian Silbernagel, the 30(b)(6) representative on classification at JPCC, corroborated Simmons's testimony by explaining that the classification department factors three years of history into an inmate's classification.[56] Although Silbernagel corroborates Simmons's

---

[53] *See id.*

[54] *See id.* at 9–10. Simmons testified that her recommendation would have gone to Special Investigations Unit, who would have made the final decision as to placing Shorter on administrative segregation.

[55] Doc. 33-4 at 19 ("We go back to three years, or we only keep – we keep paperwork up to three years."); *id.* at 23 ("That was what the rules were, three years, go back three years."); *id.* at 32 ("You would only go back the three years."); *see also id.* at 27:

> Q. . . . But, you know, based on your training and policies, you did not consider any of this information about Press Shorter's history because it was older than three years; is that correct?
> A. That's correct.

As noted above, the one exception to this three-year limit was that if an inmate had known enemies, then those enemies would stay relevant for longer than three years. *See id.* at 21–26.

[56] Doc. 33-9 at 17–18:

> Q. You know, an inmate like that, you would look – and I know you're just – I'm not sure if you classified [Shorter] or not, but would you say that he was a candidate for going on administrative segregation from the get-go?

claims about the three-years rule at certain points, he also states that officers do consider an inmate's history during classification, but if the inmate is gone from JPCC for more than three years, then that historical information is destroyed.[57] This implies that disciplinary history older than three years *could* be relevant, if an inmate was in jail continuously for more than three years or

---

A. No.

Q. For the safety of inmates and staff?

A. No, because a lot of that information was well over ten years old. We only have record of the three.

Q. Right, but I think we talked, and I think you said that the Criminal History Report that we just looked at was available to you?

A. Right. It was available. It's available to me and anybody else that runs it, but we factor for the three.

*Id.* at 20–21:

Q. Right, but I mean, just you sitting and looking at [Shorter's] criminal history, why stop using it if it's older than three years old?

A. We only have at hand three years. If I go – that's, again, that stuff is within ten years old that you were just bringing up.

Q. Okay, so – and maybe that's what I'm misunderstanding. You said that you have criminal history only going back three years?

A. No, I didn't say that.

Q. Okay.

A. Did not say that.

Q. Then what do you mean, "We have criminal history of the three years at hand"?

A. I think the real history is we go, we have a record for three years, disciplinary, jailhouse, that factors into his classification.

*See also id.* at 17 ("We only have record of the three."); *id.* at 20 ("We only have at hand three years.").

[57] *See* Doc. 22-4 at 64–65:

Q. You don't look beyond the card and at the actual current charge?

A. We look at the current charge and what's on the card, yes.

Q. Yes.

A. And the disciplinary.

Q. Right, and that's all going to be part of the card, right?

A. Correct. Not the disciplinary. The disciplinary is not. I just, by looking at his card I can see if he was on disciplinary, and we can call and I can get the [Special Investigations Unit] Department to run through it and scan through it and see what they were for, and they can relay it back to me.

Q. Okay, but that only goes back for three years?

A. That goes back from the time that they were arrested. If they were gone for three years from their release from their last incarceration, that information is shredded.

11

if the intervals between jail time are less than three years. Notably, Shorter falls into the latter category, since he was never gone from JPCC for more three years. Critically, that means that his relevant history from 2013 should not have been destroyed and arguably should have been considered.[58]

Although the exact contours of JPCC's policy are less than crystal clear, the Court finds that Plaintiffs have raised a genuine issue of material fact as to whether JPCC has a policy of disregarding history older than three years for classification purposes.[59] Simmons testified that she was trained that way, and Silbernagel at times dismisses the relevance of historical information more than three years old.[60] Nevertheless, even if there is such a genuine issue, that does not necessarily cast Plaintiffs' claim in the conditions-of-confinement

---

[58] Shorter has arrests in Jefferson Parish from 2018, 2017, 2016, 2014, and 2013. *See* Doc. 33-6 at 152–56.

[59] Plaintiffs' briefing is inconsistent on whether the three-year rule is the only relevant condition in this case or whether there were others. *Compare* Doc. 33 at 11, *with id.* at 15–16. Nevertheless, the Court focuses on the three-years-only rule because at oral argument counsel for Plaintiffs represented that rule as the relevant condition. Additionally, the other alleged conditions identified by Plaintiffs—the poor supervision of inmates and the failure of JPCC's administration to address recent trends of violence at the jail—are not supported by "a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" Estate of Henson v. Wichita Cnty., 795 F.3d 456, 463 (5th Cir. 2015) (quoting *Hare*, 74 F.3d at 645). The only evidence of poor supervision is the alleged inability of the guard in the booth near the showers where Alexander was attacked to see into them. *See* Doc. 33-8 at 32–48, 54–55. And although there is evidence of an absence of a formal process for tracking violence at the jail, that does not prove that there is a pattern of inaction in the face of such incidents. *See id.* at 52–54.

[60] *See supra* notes 55–56; *see also* Doc. 22-4 at 60–61:

> Q. . . . I mean, you're suggesting that there's been some sort of policy decision that we're going to go back three years, and that's it?
> A. Well, let's clarify that on my end. When I say we go back three years, we keep records for three years.
> Q. For three years.
> A. Again, if you're in jail for five years or ten years or one year and you've come back within that three-year window, we still have your record. Is it going to weigh as much? No, because I can't say, "Okay. Well, when you were here three years ago, you were a problem." Again, you could have rehabilitated yourself since then.

camp. "[I]n deciding how to classify a certain case, the district court is not bound by the plaintiff's characterization. Rather, the court should carefully review the gravamen of plaintiff's petition to determine the proper classification for its analysis."[61] Having outlined in detail the factual bases for Plaintiffs' constitutional claim, the Court now addresses classification.

### ii. *Classifying Plaintiffs' Claim as a Condition of Confinement or an Episodic Act or Omission*

A conditions-of-confinement claim "is a challenge to 'general conditions, practices, rules, or restrictions of pretrial confinement.'"[62] "[C]onditions cases have concerned durable restraints or impositions on inmates' lives like overcrowding, deprivation of phone or mail privileges, the use of disciplinary segregation, or excessive heat."[63] "In many jail condition cases, the conditions themselves constitute the harm. This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions."[64] One district court has explained, "Whereas conditions-of-confinement claims challenge the constitutionality of pervasive, systemic policies and customs themselves; episodic-acts-or-omissions claims challenge the constitutionality of the way in which a policy or custom was applied by a jail official in a particular instance."[65]

---

[61] Doe v. Harris Cnty., No. H-05-03938, 2007 WL 1217979, at *5 (S.D. Tex. Apr. 23, 2007) (citing *Scott*, 114 F.3d at 53).
[62] *Estate of Henson*, 795 F.3d at 463 (quoting *Hare*, 74 F.3d at 644).
[63] *Garza*, 922 F.3d at 633; *see, e.g.*, Bradley v. Puckett, 157 F.3d 1022, 1025 (5th Cir. 1998); Burleson v. Tex. Dept. of Crim. Just., 393 F.3d 577, 589 (5th Cir. 2004).
[64] *Scott*, 114 F.3d at 53.
[65] Feliz v. El Paso Cnty., 441 F. Supp. 3d 488, 497 (W.D. Tex. 2020) (citing *Estate of Henson*, 795 F.3d at 466–67).

In contrast to conditions claims, an episodic-act claim "faults specific jail officials for their acts or omissions."[66] The Fifth Circuit has said that in episodic-act cases,

> an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.[67]

In *Gibbs v. Grimmette*, the plaintiff requested a tuberculosis skin test from jail officials, who refused to administer one, allegedly because the plaintiff was a pretrial detainee.[68] After the plaintiff later developed tuberculosis, he sued various officials for their failure to administer the test.[69] The jail had a policy of requiring testing only of those individuals who showed symptoms of active tuberculosis or who have come into contact with an infected person.[70] The defendants "did not know of any diagnosed active cases of tuberculosis that could have infected Gibbs."[71] The plaintiff's claim, then, arose out of officials refusing to test him pursuant to this policy. Classifying this claim as an episodic act or omission, the Fifth Circuit noted that the plaintiff first complained of the defendants' refusal to administer the test, and then the plaintiff pointed to the jail's policy on tuberculosis testing.[72]

In another episodic-act case, *Sibley v. Lemaire*, a mentally impaired inmate brought suit against jail officers after he intentionally injured his eyes.[73] The plaintiff advanced a conditions-of-confinement theory based on an

---

[66] *Estate of Henson*, 795 F.3d at 463.
[67] *Scott*, 114 F.3d at 53.
[68] 254 F.3d 545, 547 (5th Cir. 2001).
[69] *Id.*
[70] *Id.* at 550.
[71] *Id.*
[72] *Id.* at 548 n.2, 549.
[73] 184 F.3d 481 (5th Cir. 1999).

alleged policy that instructed guards to isolate and shackle violent inmates regardless of whether they were mentally disturbed or not.[74] The claim was that this policy hampered the ability of guards to assess deteriorating mentally ill prisoners and thus caused or permitted the plaintiff's injury.[75] Despite that theory, the Fifth Circuit determined that the proper characterization of the case was as an episodic-act-or-omission claim.[76] Because the true cause of the plaintiff's injuries was the specific officers' acts or omissions, and not the condition itself, the episodic-act standard applied.[77]

Here, as in *Gibbs* and *Sibley,* Plaintiffs first identify an act or omission by an actor, Simmons's failure to check Shorter's relevant history, and then pinpoint the alleged three-year rule as causing or permitting that failure. The plaintiffs in *Gibbs* and *Sibley,* like here, alleged that the policies that the jail officials were enacting were the true causes of their injuries. Despite the characterization of their claims, the Fifth Circuit held those to be episodic-act claims and applied that standard in both instances. This Court, as others have, must do the same.[78]

---

[74] *Id.* at 484.

[75] *Id.* at 485–87.

[76] *Id.* at 487.

[77] *Id.* at 487–88.

[78] *See Flores*, 124 F.3d 736 (holding that a case involving decedent's suicide in jail presented an episodic act despite allegation of a policy of inadequate mental health care as the condition that caused the harm); Brown v. Bolin, 500 Fed. Appx. 309 (5th Cir. 2012) (concluding that case involving allegations of policies of inadequate medical training and hostility towards reporting emergencies presented episodic-act claim because one nurse's decision was the basis for the claim, rather than the jail's medical system as a whole); Watts v. Warren Cnty., No. 3:18-CV-879, 2021 WL 2446186 (S.D. Miss. June 15, 2021) (rejecting conditions-of-confinement theory that lack of adequate medical care and subjection to assault was unconstitutional condition because the complained of harm was an episodic event and not the condition itself); *Doe*, 2007 WL 1217979, at *6 (refusing to classify a claim based on inmate's sexual assault of plaintiff as a condition of confinement because "plaintiff's harm was not immediately caused by any policy at the [jail] of overcrowding, intermittent audio and visual surveillance, or a failure to segregate detainees based on the type of offense for which they are accused").

Indeed, this case does not fit the conditions-of-confinement framework. There, the conditions themselves must constitute the harm, such as overcrowding or excessive heat.[79] That is not the case here. The other archetypal conditions case, represented by *Shepherd v. Dallas County*, fails to resemble this case as well. In *Shepherd*, the Fifth Circuit considered a conditions-of-confinement claim based on Dallas County's alleged failure to provide proper medical care to inmates with chronic illnesses.[80] The plaintiff there had hypertension and suffered a stroke while in custody at the county jail despite repeated requests for medical treatment.[81] The county argued that specific employees were to blame and the episodic-act standard should apply.[82] Rejecting this argument, the Fifth Circuit noted:

> Shepherd's claim . . . does not implicate the acts or omissions of individuals but the jail's system of providing medical care to inmates with chronic illness. . . . Shepherd relied on evidence showing that the inadequate treatment he received in a series of interactions with the jail's medical system inevitably led to his suffering a stroke.[83]

In other words, "the plaintiff indicted the entire jail medical system as a cause of his stroke."[84] Indeed, other courts upholding conditions claims have seized upon the systematic nature of the underlying allegations in light of *Shepherd*.[85]

---

[79] *See, e.g.,* Yates v. Collier, 868 F.3d 354, 360 (5th Cir. 2017) (excessive heat); *Scott*, 114 F.3d at 53 n.2 (collecting cases).

[80] 591 F.3d at 449–51.

[81] *Id.*

[82] *Id.* at 452–53.

[83] *Id.* at 453.

[84] *Bolin*, 500 Fed. Appx. at 313 (citing *Shepherd*, 591 F.3d at 453).

[85] *See, e.g.,* Campos v. Webb Cnty., 597 Fed. Appx. 787, 792 (5th Cir. 2015) ("Other cases draw a similar line, rejecting a challenge-to-conditions claim where the evidence does not show a *systematic policy or failure*.") (emphasis added); *Feliz*, 441 F. Supp. 3d at 500 ("Here, as in *Shepherd*, Plaintiff alleges that Gallegos died as a result of a series of systemic failures at the Jail Annex; namely, repeated failures to provide him with prescribed medication and repeated failures to observe him at the interval mandated by [Texas Commission on Jail Standards]. As in *Shepherd*, these allegations implicate the Jail Annex's broader 'evaluation,

16

Here, Plaintiffs' allegations are of a different nature. Plaintiffs base their claim on one interaction between Shorter and JPCC's classification department. As the Fifth Circuit has explained, "isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate."[86]

This case arises from an episodic omission. It fits the episodic-act blueprint of an actor, Simmons, interposed between the detainee and the municipality. Plaintiffs argue that a policy at JPCC caused or permitted that actor to contribute to decedent's injury and death, but that is consistent with other episodic-act cases.[87] Further, unlike in *Shepherd*, Plaintiffs' claim does not implicate the deficiencies of an entire system at JPCC, but rather the omission of a single official. Accordingly, the Court holds that this case must be analyzed under the episodic-act standard.

## B.    Applying the Episodic-Act Standard

"To establish municipal liability in an episodic-act case, a plaintiff must show '(1) that the municipal employee violated the pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference.'"[88]

As to the first element, "[a] jail official violates a pretrial detainee's constitutional right to be secure in his basic human needs only when the official had 'subjective knowledge of a substantial risk of serious harm' to the detainee

---

monitoring, and treatment' of its inmates. Unlike *Scott*, no one jailer is plainly interposed between the detainee's injury and the municipality."); Toure v. Heron, No. SA-20-CV-1036, 2021 WL 75698, at *3 (W.D. Tex. Jan. 8, 2021) ("In this case, Petitioner has not shown a pervasive pattern of serious deficiencies in providing for his basic human needs.").

[86] *Shepherd*, 591 F.3d at 454.

[87] *See supra* note 78.

[88] *Garza*, 922 F.3d at 634 (quoting *Brumfield*, 551 F.3d at 331).

and responded to that risk with deliberate indifference."[89] "Deliberate indifference is an extremely high standard to meet"; "[n]egligence or even gross negligence is not enough."[90] Instead, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[91] The official need not intend to harm the plaintiff in order to be liable.[92]

Lopinto argues that Plaintiffs cannot show that any JPCC employee acted with subjective deliberate indifference as to Alexander's wellbeing.[93] Plaintiffs make no attempt to show as much and instead argue that Lopinto was objectively deliberately indifferent.[94] An episodic-act claim, however, requires subjective indifference.[95] This Court has not been presented with a scintilla of evidence that Lopinto or Simmons knew of a substantial risk of harm to Alexander. While Simmons may have known of Shorter's dangerousness through his Code 6 score of 20, Plaintiffs have not shown that she knew Alexander would be subject to any risk created by Shorter.[96] Thus, Plaintiffs have not raised a genuine issue of material fact as to the subjective deliberate indifference of any JPCC employee. Accordingly, the Court grants summary judgment to Lopinto as to Plaintiffs' § 1983 claim.

## II. State-Law Tort Claim Against Lopinto in His Official Capacity

---

[89] *Estate of Henson*, 795 F.3d at 463 (quoting *Hare*, 74 F.3d at 650).

[90] Domino v. Tex. Dep't of Crim. Just., 239 F.3d 752, 756 (5th Cir. 2001); *Campos*, 597 Fed. Appx. at 792.

[91] *Garza*, 922 F.3d at 634–35 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

[92] *Id.* at 636.

[93] Doc. 42 at 5.

[94] Doc. 33 at 18–21.

[95] *Garza*, 922 F.3d at 634.

[96] *Cf.* Alford v. Ward, 79 Fed. Appx. 689 (5th Cir. 2003) (holding that transferring inmate to same cell block as a prisoner with whom he had fought more than a year earlier was insufficient to prove subjective deliberate indifference); Branch v. Jacobs, 334 Fed. Appx. 648, 649 (5th Cir. 2009) (finding that where one inmate is a known enemy of the other, housing the two together evinces subjective deliberate indifference).

Lopinto seeks summary judgment as to Plaintiffs' state-law claims against him.[97] Plaintiffs' Complaint states that "all of the individually named defendants were acting within the course and scope of their employment" with Lopinto.[98] Plaintiffs claim that this makes Lopinto liable through respondeat superior for the tortious acts of his employees, "including but not limited to a failure to monitor, supervise, and prevent violence among the inmates."[99]

Lopinto argues that the standard governing state law claims based on an injury inflicted by one inmate upon another requires that the penal authority know or have reason to anticipate that harm will ensue and fail to use reasonable care in preventing the harm.[100] Lopinto alleges that "the record makes plain that the staff at JPCC did not know or have any reason to anticipate that Press Shorter would attack Brian Alexander without any warning or provocation."[101] Plaintiffs counter that Lopinto had information showing Shorter's danger to other inmates in the form of his criminal history, and Lopinto's employees did not use this information to protect other inmates.[102]

"A penal institution is not an insurer of an inmate against attacks by other inmates. The standard is that of reasonable or ordinary care."[103] More specifically, "in order to hold the penal authorities liable for an injury inflicted upon an inmate by another inmate, the authorities must know or have reason to anticipate that harm will ensue and fail to use reasonable care in preventing

---

[97] Doc. 22-1 at 22–23.

[98] Doc. 1 at 10.

[99] *Id.*

[100] *See* Doc. 22-1 at 22 (citing Williams v. State Through Dept. of Corrections, 351 So. 2d 1273, 1273–74 (La. App. 1 Cir. 1977)); *see also* Parker v. State, 282 So. 2d 483, 487 (La.), *cert. denied,* 414 U.S. 1093 (1973).

[101] Doc. 22-1 at 22.

[102] Doc. 33 at 22.

[103] *Parker*, 282 So. 2d at 486.

the harm."[104] As the Louisiana Supreme Court put the standard, "we must determine whether the penal authorities . . . had reasonable cause to anticipate harm *to plaintiff* and, if so, whether they failed to use reasonable care in preventing such harm."[105]

This standard is not met where the defendant was not aware of a risk threatening the plaintiff or someone closely associated with the plaintiff. For example, in *State ex rel. Jackson v. Phelps*, the Louisiana Supreme Court held that the defendants were not liable for the plaintiff's injuries because they "had no reasonable cause to anticipate harm to plaintiff."[106] In that case, the plaintiff was attacked unexpectedly by a fellow inmate.[107] The court noted that the attack occurred without warning to the plaintiff or to prison officials, that the plaintiff never notified the institution he was afraid of being attacked by his assailant, and that the evidence indicated that no one expected any hostility between the two inmates.[108]

Here, the record reflects that no JPCC official knew of a risk of harm to Alexander. Although Simmons may have known of a general risk of harm posed by Shorter because of his Code 6 score, there is no evidence to suggest that she knew that that risk threatened Alexander in particular. Moreover, it is not clear that any JPCC official was aware that Shorter and Alexander would be housed together in the same tier of security.

Plaintiffs' citation to *Breaux v. State* is therefore unavailing.[109] There, the Louisiana Supreme Court reaffirmed the above standard and held the state

---

[104] *Id.*
[105] State ex rel. Jackson v. Phelps, 672 So. 2d 665, 667 (La. 1996) (emphasis added).
[106] *Id.*
[107] *Id.* at 666.
[108] *Id.* at 667; *see also Williams*, 351 So. 2d at 1273 (holding that prison was not negligent where officials "had no forewarning of any danger to the plaintiff, no one anticipated or foresaw any difficulty between the plaintiff" and his assailant).
[109] Doc. 33 at 22 (citing Breaux v. State, 326 So. 2d 481 (La. 1976)).

liable for failing to use reasonable care to prevent an *anticipated* attack.[110] The court found that the officials had reasonable cause to anticipate harm to the decedent. The court did not modify the standard applicable to claims based on inmate-on-inmate violence.  Here, Plaintiffs have failed to produce any facts to support that the JPCC officials should have anticipated any harm to Alexander by Shorter. Accordingly, the Court grants summary judgment to Lopinto as to Plaintiffs' state law claim.

## <u>CONCLUSION</u>

For the foregoing reasons, Lopinto's Motion for Summary Judgment is **GRANTED**, and all claims against him are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana this 12th day of January, 2022

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[110] *Breaux*, 326 So. 2d at 481–82.